1  STEPHEN YAGMAN (SBN 69737)
   filing@yagmanlaw.net
2  (for filings only)
   YAGMAN + REICHMANN, LLP
3  333 Washington Boulevard
   Venice Beach, California 90292-5152
4  (310)452-3200

5  Presented on behalf of Plaintiffs and
   Class Representatives C. Finley,
6  Wendy Lockett, E. Serin, and D. Jacobs

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                   **WESTERN DIVISION**

11

| | |
|---|---|
| 12 **PEOPLE OF CITY OF LOS ANGELES WHO ARE UN-HOUSED, AS A CLASS REPRESENTED BY C. FINLEY, C. FINLEY**, as a representative of a class of unhoused persons who reside in oversize vehicles, **W. LOCKETT**, as representative of a class of unhoused persons who reside in oversize vehicles adjacent to the Ballona Wetlands; and **E. SERIN** and **D. JACOBS**, as representatives of a class of unhoused homeless persons who do not reside in vehicles, within the City of Los Angeles, and who reside on sidewalks and in the streets,<br><br>Plaintiffs,<br><br>v. | **COMPLAINT**[1]<br><br>(To Prevent City of Los Angeles-Practiced, Negative Eugenics[2] and Nazi-Like Conduct, Against Poor People, Civil Rights Violations, RICO Violations, and Fraud, and Damages)<br><br>**CLASS ACTION ALLEGATIONS** |

---

[1] It appears prudent and efficient to file a new action to incorporate all of the claims made in prior actions that were consolidated by the court on Oct. 24, 2021, and to add a Fourth Amendment claim, based on the court's Nov. 19, 2021 minute order in No. 2:21-cv-06003-DOC(KESx).

[2] Eugenics is the mildest term that could be used to describe defendants' wrongful conduct:  both quasi-ethnic cleansing and quasi-genocide accurately could be used.

| | |
|---|---|
| ERIC MICHAEL GARCETTI, GILBERT CEDILLO, PAUL KREKORIAN, ROBERT BLUMENFIELD, NITHYA RAMAN, PAUL KORETZ, NURY MARTINEZ, MONICA RODRIGUEZ, MARQUEECE-HARRIS, MARK RIDLEY-THOMAS, MICHAEL JOSEPH BONIN, JOHN LEE, MITCH O'FARRELL, KEVIN DE LEON, JOSEPH BUSCAINO, ERIC R. EISENBERG, JOHN JONES III, JOHN LY, CRIS LIBAN, JAZMIN ORTEGA, SHIELA TEJADA DONNA CHOI, SELETA REYNOLDS, MONIQUE EARL, DEVON FARTAN, GREG GOOD, AURA GARCIA, MIKE DAVIS, JESSICA M. CALOZA, M. TERESA VILLEGAS, BARBARA ROMERO, MARK PESTRELLA, MICHAEL N. FEUER, LAPD OFFICERS MONIQUE CONTRERAS, UNKNOWN GARCIA, DEREK JACOBS, LAPD SGT. BRIAN COOK, LAPD OFFICER ADRIAN ACOSTA, LAPD OFFICER JAVIER RAMIREZ, LAPD OFFICER SOPHIE CASTANEDA, LAPD OFFICER UKNOWN GARCIA, LAPD OFFICER DEREK JACOBS, and ONE HUNDRED UNKNOWN NAMED DEFENDANTS, 1-100, <br><br> Defendants. | **JURY DEMAND** |

Plaintiffs make the following allegations, on information and belief, on behalf of plaintiffs and of putative class members, in support of the this complaint, and to prevent defendants' Nazi-Like wrongful conduct:

## JURISDICTION AND VENUE

1. Plaintiffs, **C. FINLEY, W. LOCKETT, E. SERIN**, and **D. JACOBS** all assert federal claims, under 42 U.S.C. § 1983 (civil rights) and 18 U.S.C. § 1961-64 (RICO), against defendants, subject matter jurisdiction lies pursuant to 28

U.S.C. § 1331 of the federal claims, and defendants' conduct affects and interferes with interstate commerce.

2. The matters that are the bases for this action occurred in Los Angeles County, California, and in the City of Los Angeles, and therefore venue lies in the United States District Court for the Central District of California, and in its Western Division, pursuant to 28 U.S.C. § 1391.

## THE PARTIES

3. Plaintiffs and the members of two classes are un-housed persons[3] (A) who live and stay in vehicles that are not and are more than 84 inches (seven feet)

---

[3] Federal law defines the terms "homeless" or "homeless individual" or "homeless person" to include:

(1) an individual or family who lacks a fixed, regular, and adequate nighttime residence;

(2) an individual or family with a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus or train station, airport, or camping ground;

(3) an individual or family living in a supervised publicly or privately operated shelter designated to provide temporary living arrangements (including hotels and motels paid for by Federal, State, or local government programs for low-income individuals or by charitable organizations, congregate shelters, and transitional housing);

(4) an individual who resided in a shelter or place not meant for human habitation and who is exiting an institution where he or she temporarily resided;

(5) an individual or family who--

(A) will imminently lose their housing, including housing they own, rent, or live in without paying rent, are sharing with others, and rooms in hotels or motels not paid for by Federal, State, or local government programs for low-income individuals or by charitable organizations, as evidenced by--

(i) a court order resulting from an eviction action that notifies the individual or family that they must leave within 14 days;

in height and more than 22 feet in length, parked adjacent to the Ballona Wetlands and elsewhere in the City of Los Angeles, and who number in the hundreds, perhaps thousands, Class 1; and (B) who live and stay on the streets, sidewalks, and other public properties in the City of Los Angeles, who number in the tens of thousands, with and without shelter, Class 2; and defendants are **ERIC MICHAEL GARCETTI**, City of Los Angeles' mayor; **GILBERT CEDILLO, PAUL KREKORIAN, ROBERT BLUMENFIELD, NITHYA RAMAN, PAUL KORETZ, NURY MARTINEZ, MONICA RODRIGUEZ, MARQUEECE-HARRIS, MARK RIDLEY-THOMAS, MICHAEL JOSEPH BONIN, JOHN LEE, MITCH O'FARRELL, KEVIN DE LEON, JOSEPH BUSCAINO,** who are City of Los Angeles City Council members; **ERIC R. EISENBERG, JOHN JONES III, JOHN LY, CRIS LIBAN, JAZMIN ORTEGA, SHIELA TEJADA DONNA CHOI,** who are City of Los Angeles Department of Transportation commissioners; **SELETA REYNOLDS,** who is the general manager of the City of Los Angeles Department of Transportation;

---

> **(ii)** the individual or family having a primary nighttime residence that is a room in a hotel or motel and where they lack the resources necessary to reside there for more than 14 days; or
> **(iii)** credible evidence indicating that the owner or renter of the housing will not allow the individual or family to stay for more than 14 days, and any oral statement from an individual or family seeking homeless assistance that is found to be credible shall be considered credible evidence for purposes of this clause;
> **(B)** has no subsequent residence identified; and
> **(C)** lacks the resources or support networks needed to obtain other permanent housing . . . .

42 U.S.C. §11302(a). Plaintiffs and class members are within the definition of this section, and choose to call themselves "un-housed," because "homeless" has become a pejorative term.

**MONIQUE EARL,** who is the assistant general manager of the City of Los Angeles Department of Transportation; **DEVON FARTAN,** who was the chief parking enforcement officer of the City of Los Angeles Department of Transportation; **GREG GOOD, AURA GARCIA, MIKE DAVIS, JESSICA M. CALOZA, M. TERESA VILLEGAS,** who are City of Los Angeles Department of Public Works commissioners; **BARBARA ROMERO,** who is the general manager of the City of Los Angeles Department of Public Works; **MARK PESTRELLA,** who is the director of the City of Los Angeles Department of Public Works; **MICHAEL NELSON FEUER,** who is City of Los Angeles city attorney; and **MONIQUE CONTRERAS, SGT. BRIAN COOK, ADRIAN ACOSTA, JAVIER RAMIREZ, LAPD OFFICER SOPHIE CASTANEDA, UKNOWN GARCIA, DEREK JACOBS,** all of whom are LAPD police officers, and **ONE HUNDRED UNKNOWN NAMED DEFENDANTS, 1-100** (all of whom are referred to collectively as "defendants"), and the **UNKNOWN NAMED DEFENDANTS,** whose true identities presently are unknown, who participated in the wrongful acts alleged hereinbelow, and whose conduct is culpable, and whose unknown names will be replaced by their true identities when those true identities are learned, or are persons and/or entities whose true names presently are unknown, and who may have engaged in some conduct that is culpable with respect to plaintiffs, as set forth hereinbelow.  All defendants engaged in the same conduct by participating in, facilitating, and making the decisions to enact and to enforce anti-unhoused ordinances, and to post Zone ordinances signs and no parking placards, as set forth hereinbelow.

　　　　4. Defendants each and all are sued in their individual capacities, and, for the claims made under *Monell v. Dep't of Soc. Svcs. of the City of New York*, 436 U.S. 657 (1978), all defendants are sued in their official capacities only.

5.  Two plaintiffs, Finley and Lockett, and class members of Class 1 all reside in vehicles, as described hereinabove, and use those vehicles for both intrastate and interstate travel; and two plaintiffs, Serin and Jacobs, live un-housed on the streets and sidewalks of the City of Los Angeles.

6.  Defendants and each of them play and played some material role in the acts and/or omissions alleged hereinbelow and in the setting of policies and enforcement of City of Los Angeles ordinances, and/or in running and administering the City of Los Angeles Departments of Transportation, who administer parking enforcement, and Public Works, and Department of Public Works Bureau of Sanitation and Environment, and/or in the harassment of homeless who live on the streets, and in the takings and stealing of their property, and in the wrongful conduct set forth hereinbelow.

## ALLEGATIONS COMMON TO EACH COUNT

7.  Each and every allegation set forth in each and every averment herein is incorporated by this reference in each and every other averment and allegation of this pleading.

8.  All acts and/or omissions perpetrated and/or engaged in by each defendant in their individual capacities were done maliciously, callously, oppressively, wantonly, recklessly, with deliberate indifference to the rights allegedly violated, despicably, with evil motive and/or intent, in disregard of the rights of plaintiffs and class members, and in clear violation of the federal Constitution and of the California Constitution, and of controlling federal law, both statutory and common law, as set forth by both the United States Supreme Court and the United States Court of Appeals for the Ninth Circuit.

9. a. City of Los Angeles ordinance § 80.69.4, whose enforcement is the basis for some of the claims made in this action, provides as follows:

## SEC. 80.69.4.  PARKING OF OVERSIZE VEHICLES.
(Amended by Ord. No. 182,741, Eff. 11/11/13.)

(a)  No person shall stop, stand or park, when authorized signs are in place giving notice of the restriction, any oversize vehicle, defined as a *motor vehicle in excess of 22 feet in length or over 84 inches in height, between 2:00 a.m. and 6:00 a.m.*  The registered owner of the oversize vehicle or other person having control of the oversize vehicle shall also be in violation of this section if he or she has knowledge that the oversize vehicle had been so parked and the person parking had the express or implied permission to operate the oversize vehicle.

(b)  *Oversize vehicle restricted areas or streets may be established in either of the following manners*:

(1)  *The Council may authorize, by resolution, the streets upon which the parking of oversize vehicles shall be restricted between 2:00 a.m. and 6:00 a.m.*, except for those oversize vehicles displaying a valid permit issued pursuant to the provisions of Subsection (c) of this section.  *Upon Council action designating streets with oversize vehicles parking restrictions*, the Department of Transportation shall cause appropriate signs to be erected in those streets, indicating the parking limitation prominently on the sign and stating that motor vehicles with valid permits shall be exempt from the restrictions.

(2)  A Councilmember representing the district in which fewer than six street segments are impacted by the unrestricted parking of oversize vehicles may request the Department of Transportation to investigate and make a determination whether or not the parking of oversize vehicles on those street segments between 2:00 a.m. and 6:00 a.m. is adversely impacting the visibility of oncoming traffic, creating constrictions in the traveled way, or substantially reducing the availability of parking for residents and businesses.  For the purpose of this section, a street segment consists of both sides of a street between two adjacent intersecting streets. To make this request, the Councilmember shall send a letter to the Department of Transportation identifying the street segments to be included in the restricted area, the reasons for the request, and verifying receipt of petitions showing support for the restriction by a substantial number of affected community residents.

Upon receiving a written request from a Councilmember pursuant to this subdivision, the Department of Transportation shall conduct an investigation to determine whether or not the parking of oversize vehicles between 2:00 a.m. and 6:00 a.m. on the designated street segments is adversely impacting the visibility of oncoming traffic, creating constrictions in the traveled way, or substantially reducing the availability of parking for residents and businesses.  In making its determination, the Department shall consider all relevant factors, including without limitation, the location of driveways relative to parked oversize vehicles, the width of oversize vehicles when compared to other parked vehicles, the existing availability of parking, the impact the oversize vehicles are having on parking availability for residents and businesses, the effectiveness of restricting oversize vehicle parking in alleviating any adverse impact on the visibility of oncoming traffic, constrictions of the traveled way and reduced parking supply, and whether signs may be erected on the street segments in a manner that provides adequate notice of the restriction.  The Department of Transportation shall report the results of its investigation and determination to the City Council.  The City Council may, by resolution authorize the street segments upon which the parking of oversize vehicles shall be restricted between 2:00 a.m. and 6:00 a.m., except for those oversize vehicles displaying a valid permit issued pursuant to the provisions of Subsection (c) of this section.  Upon Council action designating street segments with oversize vehicle parking restrictions, the Department of Transportation shall cause appropriate signs to be erected in those street segments, indicating the parking limitation prominently on the sign and stating that motor vehicles with valid permits shall be exempt from the restrictions.

(c)   Notwithstanding the above, the parking of oversize vehicles, as defined in Subsection (a) of this section, shall be allowed in areas established pursuant to the provisions of Subsection (b) of this section, provided that the oversize vehicle properly displays a valid permit that was issued in advance by the Department of Transportation.  The permit shall be issued for a fee of $10.00 per day and for a period not to exceed three consecutive days.  The use of this permit shall be limited to the purchasing resident's street segment, or adjacent street segment if authorized by the Department.  A permit issued pursuant to this subsection shall not guarantee or reserve to the holder an on-street parking space.

8

(Emphases added.)  This ordinance, which has no effect unless and until the "authorized" parking signs provided for in it are authorized and then deployed, *see* Exhibit 1 hereto, *infra*, was not enforced by the placement of such signs until within the last two years, and which now is used as a cudgel against unhoused persons who live in their motion vehicles.

9. b. On Aug. 23, 2021, defendants unlimitedly represented to the court that it had placed a moratorium with respect to this ordinance and that they "did not limit [the] moratorium to any specific ordinance; [and] instead . . . [had] issued a broad ban on towing 'any vehicle if dwelling evidence is visible.'"  No. 2:21-cv-06003-DOC, Doc. 38, at 4:para. 1.  Plaintiff's vehicle and the other vehicles beside the Ballona Wetlands all have "dwelling evidence [that is] visible."

10. Attached to the original complaint in *Finley*, 2:21-cv-06003-DOC(KESx), as Exhibit 1,[4] and whose contents are incorporated herein by this reference, is an accurate exemplar of the standard City of Los Angeles "authorized sign" described in Ordinance 80.69.4(a), which both prohibits parking and threatens the towing of vehicles, by its depiction of a tow truck hoisting-up a vehicle for towing, and the posting of which signs is fraudulent, extortionate, and obstructs justice by violating federal law, *see infra*.

11. There are many thousands, of these "authorized signs" all over the City of Los Angeles, each one of them authorized by some defendants, and/or implemented by some defendants.

12. The Eighth and Fourteenth Amendments to the United States Constitution prohibit the threatening of and/or imposition of penalties for merely being on, including sitting, sleeping, lying, or parking vehicles on public property,

---

[4] All exhibits attached to the existing complaints and all other documents submitted by plaintiffs in those actions to the court are incorporated herein by this reference.

9

for homeless individuals who cannot obtain permanent shelter. The Fourth
Amendment prohibits the seizures of unhoused persons' property. *See* Doc. 103 in
No. 2:21-cv-06003-DOC(KESx), whose contents are incorporated herein.

13.  Sitting, lying, and sleeping are defined as acts or conditions, that are
universal and unavoidable consequences of "being human," as is parking a vehicle
that is one's only means of "housing" on a public street. Homeless persons'
ownership of their property also is a consequence of being human.

14.  The conduct of parking an oversize vehicle here is conduct that is
involuntary and inseparable from the status of being unhoused -- they are one and
the same, given that human beings are biologically compelled to rest, whether by
sitting, lying, or sleeping.

15.  As a result, just as governments may not criminalize the state of being
"homeless in public places," government may not "criminalize conduct that is an
unavoidable consequence of being homeless -- namely sitting, lying, or sleeping
on the streets," or owning property, including shelter, while existing on the streets.

16.  So long as there is a greater number of homeless individuals in the City
of Los Angeles than the number of available beds in its shelters, which has for
many years been and presently is the case, the City of Los Angeles and defendants
mayor, council members, commissioners, and administrators of the Departments of
Transportation and Public Works, and the Public Works Bureau of Sanitation and
Environment, cannot threaten, extort, penalize, or prohibit, or threaten or attempt
to do so, unhoused  individuals, for involuntarily being in, parking in, sitting,
lying, and sleeping on public property, or confiscating their property. The City
official defendants have been told this over, and over, and over, for at least 15
years, since 2006, in *Jones v. City of Los Angeles*, 444 F.3d 118 (9th Cir. 2006),
and again in 2014, in *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir.
2014), and yet again in 2019, in *Martin v. City of Boise*, 920 F.3d 584, 604 (9th
Cir. 2019), all of whose contents are incorporated herein, and in which in *Martin*

the City of Los Angeles and defendant Feuer petitioned the United States Supreme Court for a writ of certiorari, which was denied, and which Feuer contended was so that the Court could "clarify"[5] the Ninth Circuit's ruling, but none of these precedential rulings, all of which were and are binding on the City and all of its officials and employees, has had any effect on the officials' wrongful behavior. *See* "Using new law, L.A. City Council [all defendants herein] bans homeless encampments at 54 spots," Exhibit 7 in *Lockett*, detailing that just five days before this complaint will have been filed on Oct. 24, 2021, that on Oct. 19, 2021, defendants herein, the mayor, 12 of the City council members, and defendant and defense counsel Feuer, yet again enacted ordinances and counseled on the enactment of ordinances, to ban homelessness, the council members by a 12-2 vote.

17. As long as there is no option of sleeping indoors, the City government and defendants may not criminalize indigent, homeless people for being outdoors, parking the vehicles in which they exist on City streets, sleeping outdoors, on public property, based on the false premise they these human beings had any choice in the matter.

_____

[5] *See* Exhibit 2 hereto to the SAC in *Lockett*, and which is incorporated herein, a press posting on Feuer's official City website, in which it is stated that "LA is asking the Supreme Court to *clarify* the extent of the City's authority with respect to the conduct of homeless residents who dwell on its streets." (Emphasis added.) Feuer stated that the *Martin* case's "rationale sweeps too broadly, and the opinion is internally inconsistent and unclear[,] [and] leaves jurisdictions like Los Angeles without the certainty necessary to balance intensely competing interests without risking costly and time-consuming litigation." The Court denied the certiorari petition. Yet, *Martin* is not unclear, did not need "clarification," and now here we are with costly and time-consuming litigation, only because defendants, led by Feuer, simply and flatly refuse to comply with *Martin*'s dictates. Feuer and defendants lost, but like former President Trump, they continue to refuse to acknowledge that loss.

11

18. Resisting the need to be somewhere, to eat, to sleep, or to engage in other life-sustaining activities is impossible. Avoiding public places when engaging in these otherwise innocent conducts is impossible: as long as the unhoused plaintiffs and class members do not have a place where they can lawfully be, the challenged ordinances, as applied to them, effectively punish them for something for which they may not be convicted under the Eighth Amendment, and hence, the Fourteenth Amendment, to wit, being, sitting, lying down, sleeping, eating, parking their vehicles, and other innocent conduct, so that the challenged ordinances, both on their faces and as applied against the homeless, are unconstitutional.

19. The use of the ordinances criminalizes the simple acts of being outside on public property, when one has nowhere else she or he can be, they penalize the condition of being a human being, and, in that sense are prohibited status crimes.

20. A municipality and its officials may not lawfully or constitutionally criminalize such behavior, consistently with the Eighth Amendment, and hence the Fourteenth Amendment, when no sleeping spaces are practically available in a sufficient number of places and/or shelters. Defendant Feuer and all defendants surely know this from *Martin*, and this needs no clarification.

21. So long as there is a greater number of homeless individuals in the City of Los Angeles than the number of available beds in shelters, for the unhoused, City of Los Angeles and defendants may not legally enforce ordinances against unhoused individuals, for involuntarily parking, being, sitting, lying, and/or sleeping in any public place.

22. Ordinances violate the Eighth Amendment, and hence the Fourteenth Amendment, insofar as they impose criminal sanctions against unhoused individuals, for being and/or lying down and/or sleeping outdoors, or parking their vehicles where all others legally are permitted to park, on public property, when

no alternative shelter is available to them. *Martin* clearly and unequivocally states this, and it is binding on all defendants, who refuse to obey it, yet it is the law.

23.  There is no rational basis to prohibit parking an oversize vehicle ***only*** between the hours of 2:00 a.m. and 6:00 a.m. at the places at which placards have been posted, much less any compelling government interest, or for any of the other ordinances and their implementations as set forth herein.

24.  To be clear, defendants' so-called "Zone" ordinances, see below, which provide for virtually perpetual street and sidewalk cleanings clearly are pretextual, in that they create the false appearance that their function is cleaning, when in fact and in reality they serve as a fictitious means for defendants to rid the City's streets and sidewalks of the unhoused, and to confiscate their property, as a means to just make them go away or disappear: the higher-up defendants use the Sanitation Department workers to clear away the unhoused's belongings, similarly to the way the Nazis used Jewish people as straw bosses[6] in the Nazi concentration and extermination camps, and the LAPD defendants, enforce this by "standing guard," like Heinrich Himmler's[7] *Geheime Staatspolizei* (the Gestapo) while the Sanitation workers confiscate and steal the unhoused's property, taking it far away for "storage," to a place that the unhoused cannot reasonably reach, and then the property is thrown out.  This is the principal means by which defendants attempt to rid the City of the unhoused, making it impossible for them to exist at all, with no

---

[6] A worker who has some responsibility, but little authority.

[7] The head of the *Schutzstaffel* (German for "Protection Squads," or "Protection Echelon," the "SS," self-described political soldiers) and the Third Reich's chief of police, from 1936 until his dismissal on May 6, 1945, just 17 days before his suicide on May 23, 1945, as a British prisoner, at an interrogation camp near Lüneberg, Germany.

tents for shelter, no sleeping gear, and often no personal belongings at all. It is inhumane and it is horrible.

25. All of these actions by defendants were and done intentionally, in concert, they are coordinated, conspiratorially, and were both attempts to do and the doing of things that constitute fraud, extortion under both state and federal law, and which obstruct justice, all as set forth more fully herein.

26. Defendants' actions are a form of government-sanctioned eugenics[8], to alter, by government edict -- here, a parking and "Zone" ordinances, a specific population that is disfavored by society and by government.

27. In general, eugenics is the practice of arranging a human population to increase or to decrease the occurrence of characteristics regarded as desirable or undesirable. Here, poverty -- the state of being poor -- is regarded by defendants as being an undesirable characteristic, and defendants' wrongful conduct as alleged herein is designed to decrease the visible manifestations and occurrences of this characteristic in public places. It is akin to the Nazis' and the *Geheime Staatspolizei*'s treatment of the Romani population, and the same treatment of the Romani (colloquially known as "Roma") by many countries in modern-day Europe.

28. The American eugenics movement was formed during the late Nineteenth Century and continued as late as the 1940s, and to a much lesser extent

---

[8] "Eugenics" (/juːˈdʒɛnɪks/ *yoo-JEN-iks*; from Greek εὐ- "good" and γενής "come into being, growing") is a set of beliefs and practices that aim to improve the genetic quality of a human population, historically, and here, by excluding people and and/or groups of people judged to be inferior, or promoting those judged to be superior. In recent years, the term has seen a revival in bioethical discussions, on the usage of new technologies, such as CRISPR (a gene therapy technique) and genetic screening, with a heated debate on whether these technologies should be called eugenics or not.

14

into the late 20th Century.[9] (Negative eugenics did not originate with the Nazis, as commonly is believed to the case: rather, the Nazis got it from the Americans.) The American eugenics movement embraced negative eugenics, as a purported method of improving the human race, and was increasingly discredited as unscientific and racially-biased during the 20th Century, especially after the adoption of its doctrines by the Nazis (in order to justify their treatment of Jews, Romani, disabled people, and other minority groups). Incredibly, eugenics was *not* invented by the Nazis, but rather was first employed by "scientists" in New York, principally Charles Benedict Davenport, a Brooklyn-born, Harvard biology professor, and anti-miscegenistic, who believed that race determined behavior. That is, the Nazis got eugenics from the Americans. It is important to recognize that, in America, eugenics was and is a movement used to reduce an undesired population -- as defendants here use their City of Los Angeles, subject ordinances to push racist, classist, and ableist ideals, rather than a movement that explicitly worked toward the improvement of the human race, against unhoused persons, who are "an undesired population." *See also*, involuntary sterilization, lobotomization, and William Sheldon's somatotyping, all also conceived and

---

[9] Many Americans, especially those born after the WWII, Baby Boomers, and post-Baby Boomer generations, incorrectly believe that Stanford Univ. Professor William Bradford Shockley, Jr. was the father of eugenics. He was not. In the 1970s, Shockley contended that a higher rate of reproduction among the less intelligent was having a dysgenic effect, and that a drop in average intelligence would ultimately lead to a decline in civilization. He also claimed that blacks were genetically inferior to whites on an intellectual level -- a view held by the National Football League until June 2021, as a means for denying brain-damaged, Black former players equal compensation to White players in the brain damage class action settlement. (Shockley was a candidate for the Republican nomination in the 1982 United States Senate election in California. He ran on a single-issue platform of highlighting the "dysgenic threat" of some racial groups, including African-Americans, to American society.)

15

pioneered in America.  The English-language term "eugenics" translates to "well-born," from the Greek word, "*eugenes*."  Eugenics reinforces the prejudices of the time by deeming those with desirable genetic traits such as White, of higher economic status, and healthy, when, on the other hand, those with undesirable traits are identified as non-White, of lower economic status, or  physically or mentally disabled.

29.  Defendants are practicing modern-day eugenics against plaintiffs and class members. *See also LA Alliance for Human Rights v. City of Los Angeles*, 2:20-cv-02291-DOC-(KESx), Doc. 227 (04/20/21).

30.  Plaintiffs and class representatives SERIN and JACOBS are un-housed persons who live in the streets of Los Angeles, on sidewalks and elsewhere, both of whom are subject to at least two additional, "Zone," unconstitutional ordinances.

31. These ordinances are colloquially known as "Zone" ordinances because they establish zones from which the unhoused are sought to be and are expelled.

32. Under the pretenses of "Health Hazard Removal" and "Comprehensive Street & Sidewalk Cleaning," the ordinances thinly-veiled purpose and effect is to get un-housed persons off the streets and sidewalks of the City of Los Angeles, and out of sight.  Examples of the signage that advertises these ordinances are attached in *Lockett* as Exhibits 3 & 4, and their contents are incorporated herein.

33. They dictate "Zone Boundaries," displayed as maps, and then dictate that in those zones there will be "Health Hazard Removal" on "Monday, Tuesday, Wednesday, & Friday," during which times City employees from the Sanitation Bureau, backed-up with muscle by LAPD officers, remove un-housed persons' belongings, including tents, sleeping gear, and other personal items, and that, on "Every Thursday, Between 7 am and 3pm" "During comprehensive cleaning no one will be allowed to remain on a sidewalk."  Thus, under this type of ordinance,

from Mondays through Fridays, City officials, sanitation workers, and cops manage to keep all un-housed persons of the sidewalks and streets, and those who remain have all of their belongings stolen by the City and its employees.

34. Truly amazingly, as to any of these Zones that are not in Downtown Los Angeles, an un-housed person would have to travel to a City-operated facility with the Orwellian name of "The Bin," located at 507 Towne Avenue, in zip code 90013, as evidenced in Exhibits 3 & 4, so that the un-housed in Venice Beach, of whom plaintiff Jacobs is one, would need to travel somehow to "The Bin" to retrieve literally all of his belongings, that were stolen from him in Venice Beach on Oct. 21, 2021, at 7:30 a.m., as set forth hereinbelow.  Attached hereto as Exhibit 5 is a computer printout of a Rand McNally directions map which shows that the distance from 1010 Main Street in Venice Beach, where plaintiff Jacobs resides, is 17.4 miles, which this plaintiff has no ability whatever to travel, and then 17.4 miles back, for a total of 34.8  miles, which means he never will be able to get back every one of his belongings whose theft from him defendant Contreras supervised and enforced on Oct. 21, and which conduct was ratified by defendant Cook on Oct. 22, 2021. Beginning on Oct. 21, Jacobs has been forced to exist and to sleep at night unsheltered, and in very cold and rainy weather.

35. Defendants Contreras and other LAPD officers oversaw and enforced the theft of Jacobs' property, and, on Oct. 22, 2021, defendant Sgt. Jacobs condoned, approved of, and ratified Contreras' and the other LAPD officers' wrongful conduct.

36. Similarly, plaintiff Serin, who resides in a tent on the sidewalk in Playa Vista (just south of Marina del Rey, which is just sought of Venice Beach), alongside the Jefferson Boulevard un-housed, vehicle dwellers encampment, and whose personal belongings have been regularly stolen from him by City workers, and enforced by LAPD officers, would need to travel 34.44 miles round trip to get

back the property stolen from him. Attached hereto is as Exhibit 6 is a computer printout of a Rand McNally directions map which shows that the distance from 13044 Pacific Promenade in Playa Vista, just across Lincoln Boulevard from where plaintiff Serin resides, is 17.22 miles, which this plaintiff has no ability whatever to travel to, and then 17.22 miles back, for a total of 34.44 miles, which means he never will be able to get back every one of his belongings, whose theft from him defendant LAPD officers supervised and enforced.

37. On Oct. 21, 2021, at approximately 7:30 a.m., plaintiff Jacobs was sitting in front of the tent in which he had slept, when a "waste team" confronted him, backed up by about 10 LAPD officers, including defendant LAPD officers Contreras, who was in charge of the LAPD contingent, Garcia, and Derek Jacobs, ordered him to remove his belongings from the sidewalk, which he put in the street pursuant to their commands, they then put a yellow tape cordon around his belongings, threw his belongings on the sidewalk, and confiscated them, telling him that he could retrieve them at the "Bin," at 507 Towne Avenue, Los Angeles 90013, over 17 miles away, in downtown Los Angeles. The belongings stolen from him included his clothing, his wallet, his bank cards, several hundred dollars in cash, and a container, which were all of his belongings.

38. Exhibit 8 in *Lockett* collectively depicts plaintiff Jacobs standing outside the cardboard shelter he made and in which he slept on the evenings of Oct. 21-23, after Sanitation workers stole his tent, over which theft defendant Contreras and other LAPD thugs presided, and that shelter, taken on Oct. 24, and its contents are incorporated herein.

39. Exhibit 9 in *Lockett* collectively depicts the Special Enforcement and Cleaning Zone signs near plaintiff Jacobs' place of habitation, and its contents are incorporated herein.

40. Exhibit 10 in *Lockett* depicts an LAPD "Pacific Area Senior Lead Officer Basic Car Map," on which defendants Contreras, Ramirez, Acosta, and Castaneda are depicted, and its contents are incorporated herein.

41. On many occasions within the past year, plaintiff Serin's belongings have been stolen by Sanitation workers backed-up by LAPD muscle, under the guise of a clean-up, and he presently is unable to identify the workers or the LAPD officers, and never has been able to recover his belongings.

42. Plaintiff Finley is Black, and plaintiffs Lockett, Serin, and Jacobs all are White.

43. Defendants Acosta, Caloza, Contreras, Ramirez, Castaneda, Unknown Garcia, Aura Garcia, Ramirez, Romero, and Villegas all are Hispanic/Latino/a.

44. It is alleged on information and belief that the Hispanic/Latino/a defendants acted against the Black and White plaintiffs as a consequence of Hispanic/Latino/a negative animus toward Whites and Blacks, and the Hispanic/Latino/a population of the City of Los Angeles outnumbers both the White and Black populations of the City of Los Angeles.

45. All of the LAPD defendants, except Cook, who ratified, condoned, approved of, and acquiesced in Contreras' and her subalterns' and her factotums' unconstitutional conduct toward plaintiff Jacobs, are Hispanic/Latino/a, and it is alleged that their treatment of Jacobs was motivated by invidious race hatred. Contreras previously engaged in harassing behavior toward plaintiff Finley. And Cook, who is White, previously engaged in harassing behavior toward plaintiff Finley and her spouse, R. White. Both Finley and White are Black, and it is alleged that Cook's bad conduct toward them was motivated by invidious race hatred toward Blacks.

46. The court's Nov. 19, 2021 minute order in *People of the City of Los Angeles Who Are Un-Housed v. Garcetti*, 2:21-cv-06003, and all of its contents, Doc. 103, hereby is incorporated herein by this reference, and it is attached hereto.

47. All of the attachments and exhibits to documents submitted to the court in the pending *Finley* action and its two consolidated actions, *Finely* and *Lockett*, are incorporated herein.

48.-99.  Reserved.

## COUNT 1
### (Fourteenth Amendment, Equal Protection Violations, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983)

100.  The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits state action that discriminates against a suspect class of persons, and makes a state governmental unit responsible for the equal protection of its citizens, and provides that "nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws.

100a.  The Equal Protection Clause contains the right of the people to be exempt from unfriendly legislation, exemption from legal discriminations that imply an inferiority in civil society, and which lessen the enjoyment of rights which others enjoy.

100b.  Defendants subject ordinances violated plaintiffs' and class members' right to equal protection of the laws because it is legislation that is unfriendly to them, since it is aimed only at them and at no other class of persons, it subjects only them to legal discrimination -- indeed, it cannot be contested that it is only them against whom it discriminated, it implies their inferiority in civil society, and it lessens their enjoyment of rights which other human beings enjoy.

## COUNT 2

**(*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)**

101.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs' and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 3
**(Conspiracy, against all defendants, in both their individual and official capacities 42 U.S.C. § 1983)**

102. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

//

//

//

//

## COUNT 4
**(Fourteenth Amendment, Due Process Violations, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983)**

103.  The Due Process Clause of the U.S. Constitution provides "nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

103a.  The defendants' behavior alleged herein is so egregious, so outrageous, that it fairly may be described as shocking to the conscience, and also it is arbitrary and capricious action by the government: it is an exercise of power without any reasonable justification or legitimate governmental purpose:  plain and simple, it is government bullying of those who are least able to defend themselves; it violates the decencies of civilized conduct in a civilized society; it is brutal and offensive, and it does not comport with basic concepts of fair play and decency, so that it violates plaintiffs' and class members' substantive due process rights, because it is the government using its vast power arbitrarily and oppressively.  It deprives plaintiffs and class members of property without due process of law, both procedurally and substantively.

## COUNT 5
**(*Monell* Violations, against all defendants, against all defendants, in their official capacities 42 U.S.C. § 1983)**

104.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal

rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs' and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 6
### (Conspiracy, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983)

105. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

## COUNT 7
### (Fourteenth Amendment, Privileges and Immunities Abridgement Violations, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983)

106. The Privileges and Immunities Clause of the Fourteenth Amendment provides that "No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States."

106a. California Welfare & Institutions Code § 17000 provides that

> every city . . . shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein . . . .

106b. This state law provides the substance of a privilege and immunity enjoyed under state law to plaintiffs' and class members, and defendants' conduct violates plaintiff's and class members' Fourteenth Amendment privileges and

immunities rights (and this as well violates plaintiffs' and class members' rights to both equal protection and to due process).

106c. Plaintiff Finley is a citizen of Texas and plaintiff Jacobs is a citizen of New York.

## COUNT 8
### (*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)

107.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 9
### (Conspiracy, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983)

108. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

## COUNT 10

**(Eighth Amendment, Cruel and Unusual Punishments Infliction Violations, against all defendants in both their individual and official capacities, 42 U.S.C. § 1983)**

109.  The Eighth Amendment Cruel and Unusual Punishment Clause provides that "nor cruel and unusual punishments [may be] inflicted."

109a.  The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits the imposition, or threat to impose, penalties for sitting, or lying outside, or parking a motor vehicle on a public street, by unhoused persons who cannot obtain shelter, and whether these activities are defined as acts or conditions, they are inseparable from status, they are universal and unavoidable consequences of being human -- they are one and the same thing, and are involuntary conduct that is inseparable from status, because human beings are biologically compelled to rest, whether by sitting, lying, or sleeping, and all of these things must occur some place, here in on sidewalks, on streets, and in vehicles that are banned by the subject ordinances.

109b.  The state may City of Los Angeles may not criminalize and/or punish, threaten to punish, or attempt to punish the state of being unhoused in public places, nor may it criminalize conduct that is an unavoidable consequence of being unhoused.

109c.  As long as there is no option of sleeping indoors, defendants may not criminalize indigent, unhoused persons for being outdoors, on public property, like streets, on the false premise that that they had a choice in the matter.

109d.  Resisting the need to eat, sleep, or engage in other life-sustaining activities, or parking one's motor vehicle in order to be able to do these things, is impossible.

109e.  Avoiding public streets when engaging in this otherwise innocent behavior also is impossible.

109f.  Unhoused persons who must sleep in their vehicles may not be punished, without the punishment being cruel and unusual, because such persons may not be convicted under the Eighth Amendment for innocent conduct.

109g. Prohibiting or interfering with sleeping in a public place as applied to unhoused persons is unconstitutional, as is the taking away of their property and/or housing.

109h.  Here, defendants' application of their ordinances criminalizes conduct that is not criminal, and thus is unconstitutional.

109i.  Ordinances that make the use of public property as a temporary or permanent place of dwelling, lodging, or residence, for storage of personal belongings, for cooking, or using temporary structures -- such as vehicles, or as a living accommodation, or any of these activities in combination with one another, at any time between sunset and sunrise -- here, between 2:00 a.m. and 6:00 a.m., or on days of the week, is unconstitutional.

109j.  The subject ordinances are aimed only at unhoused persons who live in their campers and RVs, or who reside in the streets or on sidewalks, and, as such are unconstitutional.

109k. The false flag Zone ordinances that are disguised as ordinances that facilitate street and sidewalk cleanings, in fact are aimed and purposed at something altogether different, to wit, to get rid of homeless people, and, as such, are unconstitutional.

## COUNT 11
### (*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)

110.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the

fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs' and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 12
**(Conspiracy, against all defendants, in their official capacities, 42 U.S.C. § 1983)**

111. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

## COUNT 13
**(Eighth Amendment, Excessive Fines Imposition Violations, against all defendants in both their individual and official capacities, 42 U.S.C. § 1983)**

112. The Eighth Amendments' Excessive Fines Clause provides that "nor shall excessive fines [be] imposed."

112a. A fine is "excessive" if it is not proportional to and related to the gravity of the offense that it is designed to punish.

112b. The factors to be considered are the nature and extent of the underlying offense (none), whether the underlying offense is related to other illegal activities (none), whether other penalties may be imposed for the offense

(none), and the extent of the harm caused by the offense (none).  Here, defendants created and enforce ordinances to keep rich, habitated folks, who don't want to be bothered by seeing poor, unhoused folks who are forced to live on the sidewalks and streets and in vehicles, and none of the four, evaluative factors is applicable, so that the subject ordinances' and their enforcement -- by confiscating and stealing unhoused persons' property and by towing away an offending vehicle, and thus depriving a poor person or her or his home, is Nazi-esque, unfounded, draconian, and unconstitutional.

112c.  The horror of a rich person having to endure seeing a poor person at all or a poor person's camper or RV, or, indeed, the actual poor person, is not a legitimate reason for enforcement of the subject ordinances.  It is an ugly, neighborhood beautification project.

113d. Defendants' wrongful conduct, as set forth hereinabove is in violation of the Ninth Circuit's decision in *Pimentel v. City of Los Angeles*, 974 F.3d 917 (9th Cir. 2020) (Eighth Amendment's Excessive Fines Clause applies to municipal parking fines, notwithstanding that California changed its categorization of parking fines from criminal penalties to civil penalties), *as amended on denial of reh'g and reh'g en banc*, in which two of the City defendants' defense counsel herein, defendant Feuer and Gabriel Dermer, lost in the Ninth Circuit.

## COUNT 14
### (*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)

113.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice,

procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs' and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 15
**(Conspiracy, against all defendants, in their official capacities, 42 U.S.C. § 1983)**

114. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

## COUNT 16
**(Right to Travel Violations, against all defendants in both their individual and official capacities, 42 U.S.C. § 1983)**

115. The right to travel, both intrastate, interstate, and intra-municipal, is both a federal right and a state right, which state right has become a part of the federal right to substantive due process of law, and is a basic human right, and as such is a right implicit in the concept of a democratic society that is one of the attributes of personal liberty under the common law.

115a. There is a California constitutional, substantive right to travel, and it recognizes the federal right to interstate travel -- the basic right to go from one place to another, and both state and federal courts recognize the right to travel as a

fundamental right that is entitled to constitutional protection, under *both* state and federal law.

115b.  The right to intrastate travel, within a municipality, is a federal right, the enforcement of which is the § 1983 remedy, and also it is a federal right because it is incorporated in the substantive Due Process Clause of the Fourteenth Amendment, the enforcement of which also is the § 1983 remedy, and therefore, s and class members may enforce their state right to travel under § 1983.  Driving and parking a motor vehicle are inherent parts of the right to travel, and by posting their no parking placards, defendants have unconstitutionally infringed on plaintiffs' and class members' rights to travel.

## COUNT 17
### (*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)

116.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by

plaintiffs' and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 18
### (Conspiracy, against all defendants, in their official capacities, 42 U.S.C. § 1983)

117. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

118.-141.  Reserved.

## COUNT 19
### (Racketeer Influenced and Corrupt Organizations, RICO, for Fraud, Extortion, Under Both State and Federal Law, and Obstruction of Justice, against all defendants in both their individual and official capacities)

142.  By doing the things alleged hereinabove, and/or aiding or abetting them, defendants thereby engaged in and committed the related RICO predicate acts, with similar purposes, results, participants, victims, and methods of commission, over a long and continuing period of time, with a threat of continued racketeering activity, of fraud, extortion, under both state and federal law, and obstruction of justice, and continue to commit fraud, extortion, under both state and federal law, and obstruction of justice, all by using instrumentalities of interstate commerce to accomplish their crimes, and thereby are liable under the civil RICO statute, as set forth hereinbelow.

### Rico Predicate Acts

143.  **Frauds**

**A.** The fraud occurred as follows:  defendants made the material misrepresentation to the public, including plaintiffs and class members, that it was constitutionally-permissible to implement the City of Los Angeles' subject ordinances, including ordinance 80.69.4 by posting no parking placards, when

31

those representations were false, defendants intended that plaintiffs and class members rely on the ordinances, plaintiffs and class members have, in fact, relied on them, and plaintiffs' and class members' reliance on them have harmed and damaged plaintiffs and class members, who have been unable to and who have not parked their vehicles in which they live in the posted areas and who have had their property stolen by defendants.

**B.** The fraud also occurred as follows:  defendants have admitted that on Dec. 8, 2020, in an "Inter-Departmental Memorandum," Exhibit D to defendants' Opposition to plaintiff's motion for a preliminary injunction, Doc. 16-1, incorporated herein, "effective immediately," they suspended the provisions of the subject ordinance as to "any vehicle if dwelling evidence is visible."  This Memorandum never was made public.  As of the moment that Memorandum was issued, the continued existence of the subject no parking signs constituted a material misrepresentation of the law with respect to the permitting of parking in the areas where the signs were posted, defendants intended that members of the class, including plaintiffs, would rely on the restriction set forth in those signs, which was a material misrepresentation  on which plaintiffs and class members reasonably relied, the continued existence of the signs proximately caused harm to plaintiffs and class members, by preventing them from parking their vehicles where the signs were posted, and thereby harmed them, and this "suspension" of the punishments threatened by the signs coupled with the failure to remove or cover up the signs constituted and constitutes a continuing fraud.

144a.  **Extortion**  The extortion occurred as follows:  defendants, through the illegal placement of parking placards, have threatened plaintiffs and class members that were they to park their vehicles in which they live in placarded areas that their vehicles would be towed away and penalties would be imposed on them, and that their vehicles could be forfeited, so that because of this extortionate

threat, plaintiffs and class members have been extorted not to park their vehicles in contravention of the warning on the placards.

144b. **Extortion** The extortion occurred as follows: defendants, through the illegal placement of Zone ordinance placards, have threatened plaintiffs and class members that were they to remain on sidewalks, that their belongings would be confiscated and that penalties would be imposed on them, and that their belongings would be forfeited, so that because of this extortionate threat, plaintiffs and class members have been extorted not to inhabit sidewalks in contravention of the warning on the Zone ordinance signs.

145. **Obstruction of Justice** The obstruction of justice occurred by defendants preventing plaintiffs and class members from exercising their federal constitutional rights, all as set forth hereinabove.

146. Each defendant, in his/her own right, and all defendants together, collectively, as well as their employees, who work in and for the City of Los Angeles, are all enterprises and associated-in-fact enterprises, within the meaning of 18 U.S.C. 1961(4), and therefore are RICO enterprises.

146a. All of the LAPD defendants are a separate enterprise, like a true mafia, extortion/protection racket-enterprise.

147. Each and all of defendants' activities affect interstate commerce, as well as intrastate and interstate travel.

148. Each defendant received and receives income, directly and/or indirectly, by way of insurance premiums, salary, compensation, reimbursement for expenses, *per diem* costs reimbursements, meals, lodging, and/or travel, pensions, *etc.*, from the pattern of racketeering activity alleged herein, and used and uses that income in the acquisition of an interest in and/or operation of the enterprise, in violation of 18 U.S.C. 1962(a), and acquired and/or maintained

33

control over said racketeering enterprise through a pattern of racketeering activities, as set forth herein, in violation of 18 U.S.C. 1962(b).

149.  Defendants conducted and/or participated, and continue to conduct and participate in, said enterprises' affairs through a pattern of racketeering activities, in violation of 18 U.S.C. 1962(c).

150.  The pattern of racketeering activities included, and continues to include, a continuous pattern and practice potentially involving activities, including the RICO predicates of fraud, extortion, mail fraud, wire fraud, fraudulent concealment, and obstruction of justice, and defendants' defense of the instant action is and will continue to be and will be a continuation and a part of its RICO schemes, so that those who may participate in the defense of this action may make themselves liable under RICO.

151.  Defendants' associated-in-fact enterprises constitute a present and continuing threat of harm and additional RICO violations.

152.  The enterprises' activities have occurred on more than one, and on many thousands of occasions, over at least the past 35 years and have been done on numerous occasions and constitute at least a thousand separate acts, as set forth hereinabove, not including the acts that will be included as part of the defense of the instant action.

153.  At least five thousand RICO predicate acts have occurred.

154.  The wrongful acts described in the matters enumerated hereinabove occurred over a significant period of time, and are related in that they evidence civil RICO predicates, including at least fraud, wire fraud, mail fraud, extortion, and obstruction of justice, and they pose a threat of continued criminal activity, have the same or similar purposes, results, participants and kinds and categories of participants, victims, methods of commission, and are otherwise interrelated by their common characteristics and participants, they are not isolated events, but are

both continuous and systemic, and each and all constitute a continuing pattern of racketeering activity and constitute a long term threat of continuing racketeering activity.

155.  The activities led to defendants' control of and acquisition over the enterprises and resulted in the injuries to plaintiffs and class members, as alleged herein, which resulted from defendants' participation in and control of the enterprises.

156.  By failing to prevent the wrongful conduct herein alleged, misconduct that amounted to racketeering activities, all managerial and non-managerial employees and/or officers and/or agents of defendants engaged in and condoned racketeering activities.

157.  The willful and/or negligent mismanagement of the enterprises, with knowledge by defendants charged with management, and potentially other defendants, that they were and continue to be operated as a RICO enterprises, directly caused the harm to plaintiffs, as alleged herein.

158.  The enterprises are RICO enterprises because they have hierarchical structures and consensual structures for making decisions, and those structures have an existence beyond that which is necessary to commit the RICO predicate acts alleged herein, in that the hierarchical and consensual structures exist to accomplish doing business, and the structures for decision-making exist separate and apart from the racketeering activities.

159.  Each defendant unlawfully conspired with others, including other defendants, by understanding and agreeing to do and taking overt actions to support the matters hereinabove alleged, to violate the provisions of 18 U.S.C. 1962(b), (c), and (d), and, on information and belief, continued and continue to do so with the aid and assistance of co-conspirators

160.  Defendants' actions involve many thousands of City of Los Angeles unhoused residents and constitute a pattern of racketeering activity and the predicate acts as set forth hereinabove.

161. Defendants' actions have taken and thereby injured plaintiffs Serin's and Jacobs' property.

162.-199.  Reserved.

## COUNT 20
### (Violation of *Jus Cogens* International Law)

200.  Defendants' actions, as set forth hereinabove, are in clear violation of and are prohibited by the *jus cogens,* peremptory norms of international law that, among other things, prohibit official use of all cruel and unusual punishment.

201.  Such *jus cogens,* peremptory norms are the law of the land in the United States of America, and plaintiffs and class members are entitled to damages for the harm caused to them by defendants' violations of *jus cogens*, peremptory norms, and to declaratory and injunctive relief, because the Ninth Circuit, in *Siderman v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992), has held these prohibitions to be *jus cogens* norms.  That is, plaintiffs and class members claim defendants are liable to plaintiffs and class members for subjecting them to cruel and unusual punishment, in violation of *jus cogens* peremptory norms of international law, whose violation, in turn, is a violation of the law of the United States of America, under the Supremacy Clause of the United States Constitution.

## COUNT 21
### (Violation of *Jus Dispositivum* International Law)

203.  Defendants' actions, as set forth hereinabove, are in clear violation of the *jus dispositivum* treaty obligations entered into by the United States of America, and which obligations, pursuant to Article VI, Clause 2 of the United

States Constitution (the Supremacy Clause), are "the supreme law of the land . . .
any thing in the Constitution or laws of any state to the contrary notwithstanding."

204.  The specific treaties whose provisions prohibit cruel and unusual
punishments, to which the United States of America is a signatory, and whose
provisions were violated by defendants, are:  Universal Declaration of Human
Rights, G.A. Res. 217 (A) (III), U.N. Doc. A/810 at 71 (1948); the Declaration on
the Protection of All Persons from Being Subjected to Torture and Other Cruel,
Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452 (1975);
Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
Punishment, G.A. Res. 39/46, annex 39 U.N. GAOR Supp. (No. 51) at 197, U.N.
Doc. A/39/51, art. 1 (1984); Body of Principles for the Protection of all Persons
under Any Form of Detention or Imprisonment, G.A. Res. 43/173, 43 U.N. GAOR
Supp. (No. 49), U.N. Doc. A/43/49, at 297, Principle 5 (1988); the American
Convention on Human Rights, O.A.S. Treaty Series No. 36, at 1, OEA/Ser.
L./V/II.23 doc. Rev. 2, Art. 5); International Covenant on Civil and Political
Rights, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc.
A/6316 (1966), 999 U.N.T.S. 171, Art. 7; and, the European Convention for the
Protection of Human Rights and Fundamental Freedoms, 213 U.N.T.S. 222, Art. 3,
and by engaging in the conduct alleged, defendants violated those treaties and
conventions, and thereby violated the laws of the United States of America,
through the Supremacy Clause.

205.  By virtue of the violations of the provisions of these treaties, plaintiffs
and class members are entitled to recover nominal damages and punitive damages
from defendants, and to declaratory and injunctive relief.

//
//
//

## COUNT 22
### (Fraud)

206.  The fraud occurred as follows:  defendants have admitted that on Dec. 8, 2020, in an "Inter-Departmental Memorandum," Exhibit D to defendants' Opposition to plaintiff's motion for a preliminary injunction, Doc. 16-1, "effective immediately," they suspended the provisions of the subject ordinance as to "any vehicle if dwelling evidence is visible."  This Memorandum never was made public.  As of the moment that Memorandum was issued, the continued existence of the subject no parking signs constituted a material misrepresentation of the law with respect to the permitting of parking in the areas where the signs were posted, defendants intended that members of the class, including plaintiffs, would rely on the restriction set forth in those signs, which was a material misrepresentation  on which plaintiffs and class members reasonably relied, the continued existence of the signs proximately caused harm to plaintiffs and class members by preventing them from parking their vehicles where the signs were posted, and thereby harmed them, and this "suspension" of the punishments threatened by the signs coupled with the failure to remove or cover up the signs constituted and constitutes a continuing fraud.

## COUNT 23
### (Fourth Amendment Violations Under § 1983, Against All Defendants In Both Their Individual And Official Capacities)

207. Plaintiffs incorporate herein all of the material in the court's Nov. 11, 2021 minute order and, based thereon and on the allegations set forth hereinabove, allege that defendants violated all plaintiffs' Fourth Amendment rights, and by virtue thereof, are liable to plaintiffs for both injunctive relief and in damages.

//

//

//

## COUNT 24

**(*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)**

208.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 25

**(Conspiracy, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983)**

209. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

210.-272.  Reserved.

//

//

## CLASS ACTION ALLEGATIONS

273.  Plaintiffs are a member of two discrete classes of persons, whose defining characteristics are: Class 1, represented by plaintiffs Finley and Lockett, is that they are unhoused persons who reside in vehicles that are more than 84 inches in eight and more than 22 feet in length and other non-oversize vehicles, and who, *inter alia*, negatively are affected by City of Los Angeles ordinance 80.69.4, who are covered by the moratorium, and whose vehicles are parked in Venice Beach, on Jefferson Boulevard, alongside the Ballona Wetlands, and all over the City of Los Angeles, and persons who reside in regular, non-over-size vehicles, all over the City of Los Angeles; and, Class 2, represented by plaintiffs Serin and Jacobs, is that they are unhoused persons who live in the streets and on the sidewalks of Los Angeles.

274. The first class contains about 1,000 people, and the second class contains about 45,000 people, and each class is so numerous so that joinder of all members is impracticable.

275. There are only common questions of fact and of law with respect to all class members of each class, whose vehicles are in imminent jeopardy of being towed, although there is evidence visible of dwelling inside them, Class 1, and whose members are in imminent jeopardy of being ousted from their habitations on the streets of Los Angeles and their belongings, shelters, and property being stolen and/or taken away, often to a place they physically are unable to reach, possibly to reclaim it.

276.  The claims made by the representative parties of each of the two classes, plaintiffs, are typical of the claims of each class member of her or his class.

//

//

277.  The representatives of the class, plaintiffs, more than fairly, vigorously, and zealously will represent and adequately protect the interests of all class members, both themselves and through their zealous attorney.

278.  Prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to class members, which would establish incompatible standards for parties opposing the classes, and defendants have acted and will continue to act on grounds generally applicable to every class member in both classes, and the class questions not only predominate but are the only questions that exist, and this action is the far superior manner to other available methods for fairly and efficiently adjudicating the controversies.

279.  Specifically, the class members' interests in individually controlling the prosecution or defense in separate actions do not exist, and there are no anticipated difficulties in managing this class action, especially as to identification of the amount of damages, identification of class members, and providing actual notice to virtually all class members.

280.  Therefore, this action is maintainable under F.R. Civ. P. Rule 23(a), & 23(b)(1)(A),(B)(1), (2), and (3).

281.  Although there would appear to be no notice requirement, the nature of the notice to be provided to class members who live in vehicles would be that the offensive placards would be taken down, and would be decided by the court.

**WHEREFORE**, plaintiffs and class members request relief against each defendant as follows:

1.  Compensatory damages for all non-RICO violations, in sums in excess of $75,000.00, exclusive of costs and interest;

2.  Punitive damages, in a sum to be determined by a jury, and as a percentage of the net worth of each defendant, in a sum sufficient to deter future misconduct, and not less than $1,000,000.00 per defendant;

3.  Damages for the RICO violations, and trebling of them;

4.  Injunctive relief, according to law;

5.  The costs of action and interest;

6.  Attorneys' fees; and,

7.  Such other relief as is just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues.

## YAGMAN + REICHMANN, LLP

By:  /s/  Stephen Yagman
**STEPHEN YAGMAN**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. LA CV 21-06003-DOC-KES                    Date: November 19, 2021

Title: PEOPLE OF CITY OF LOS ANGELES WHO ARE UN-HOUSED ET AL. V.
    ERIC MICHAEL GARCETTI ET AL.

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

| Karlen Dubon | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):** **ORDER DENYING APPLICATION FOR TEMPORARY RESTRAINING ORDER [67]**

    Before the Court is Plaintiffs' Application for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Application" or "App.") (Dkt. 67). The Court has reviewed the Application and all supporting documentation filed by Plaintiffs, as well as the Opposition and supporting documentation filed by Defendant City of Los Angeles ("Defendant" or "City"). The Court now DENIES the Application.

## I.    Background

### A. Facts

    Plaintiff David Jacobs is an unhoused person who resides on Main Street in Venice Beach. App., Decl. of David Jacobs ("Jacobs Decl.") at 1 (Dkt. 67). Plaintiff E. Serin is an unhoused person who resides in a tent in Playa Vista, just south of Marina del Rey. Second Amended Complaint ("SAC") (Dkt. 68) ¶ 36. Both Jacobs and Serin live on streets subject to "Zone" ordinances, which establish zones in Los Angeles that are

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LA CV 21-06003-DOC-KES                                    Date: November 19, 2021
                                                                   Page 2

frequently cleaned and cleared. Under those ordinances, Serin has had his belongings
taken on several occasions. *Id.* Jacobs had his tent, clothing, wallet, bank cards, several
hundred dollars in cash, and the remainder of his belongings confiscated on October 21,
2021. Jacobs Decl. at 2-3.

       The Zones are authorized under Los Angeles Municipal Code § 56.11(c), which
prohibits personal property obstructing City operations (including sidewalk cleaning),
and § 56.11(g), which prohibits personal property in public areas that constitutes a health
or safety threat. L.A. MUN. CODE §§ 56.11(c), (g).

       The City has erected two signs on every block in these Zones. The first sign states
it is a "special enforcement & cleaning zone;" that no tents may be erected between 6:00
am and 9:00 pm; and that the City "will be conducting enhanced cleaning and trash
removal in compliance with relevant laws in this ZONE." App. Ex. 3 at 1 (Dkt. 67-1).
The sign also states that any impounded property may be retrieved at "The Bin, 507
Towne Ave., LA 90013." *Id.* The second sign states that the City will conduct "health
hazard removal" on Mondays, Tuesdays, Wednesdays, and Fridays, and "comprehensive
street & sidewalk cleaning" on Thursdays. *Id.* at 2. It notes that "no one will be allowed
to remain on the sidewalk" during cleaning. *Id.*

       The City provided the Court with Los Angeles Sanitation's Standard Operating
Protocols for carrying out these cleanings. Def.'s Supp. Briefing Ex. 1 (Dkt. 87). Those
Protocols require that workers provide notice 24 hours before any cleaning that all
property must be removed. *Id.* If any property is not cleared off of the sidewalk when
City workers arrive, unhoused individuals have 15 minutes to move their belongings, or
they will be confiscated. *Id.* All confiscated property that unhoused persons cannot pack
within 15 minutes, including tents and identification, are taken to The Bin, a facility in
Skid Row. *Id.* The Bin is 17.4 miles from the residences of Plaintiffs Jacobs and Serin,
meaning they would need to make a round-trip journey of almost 35 miles, across
multiple City districts and neighborhoods, to retrieve their belongings. *See* Jacobs Decl.
at 2. As Jacobs is unable to make that journey to retrieve his tent and belongings,
particularly after the City confiscated his wallet and bank cards, he now sleeps in a
cardboard box on the sidewalk. *Id.*

       The Bin, the storage facility where the City brings unhoused people's belongings
that it impounds, is located far from many of the locations where the City carries out
cleanings. The City provided data on pick-up rates for The Bin, demonstrating that only
17% of people ever claim their belongings. Def.'s Supp. Briefing Ex. 3 (Dkt. 87). As
such, the City is aware that more than four-fifths of the belongings it confiscates are
never picked up by their owners and are ultimately destroyed after the 90-day waiting

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LA CV 21-06003-DOC-KES                        Date: November 19, 2021
                                                       Page 3

period. The City's submission also shows that the City has four additional storage areas located throughout the City, but the Zone Protocols send confiscated belongings solely to The Bin. *Id.*

The City also filed several hundred pages that have no bearing on the ordinances challenged in this case, no relation to Plaintiffs Jacobs or Serin, and no connection to the events at issue. The Court ordered that "Defendants submit additional briefing responding to the allegations raised by Plaintiff David Jacobs." Dkt. 83. But as is apparent from the CM/ECF numbering left on the page headers, instead of responding to the Court's order, the City has simply submitted a filing it offered almost two years ago in a different case with a different judge, much of which is irrelevant.

## B. Procedural History

Plaintiffs filed their Second Amended Complaint on October 24, 2021. Plaintiffs filed the instant Application on October 24, 2021. Defendants opposed (Dkt. 71) and Plaintiffs replied (Dkt. 72) on October 25, 2021. On November 8, the Court requested that Defendants submit additional briefing responding to Plaintiffs' allegations in the TRO. Defendants filed supplemental briefing on November 12, 2021, and Plaintiffs replied on November 13, 2021 (Dkt. 88).

## II.   Legal Standard

The standards for issuing a temporary restraining order ("TRO") and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). Alternatively, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation omitted). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 21-06003-DOC-KES                                      Date: November 19, 2021
                                                                                            Page 4

### III.    Discussion

Plaintiffs seek a temporary restraining order to enjoin the City from enforcing
LAMC § 56.11 against unhoused people in Los Angeles, although Plaintiffs have not
specified which subsections they ask the Court to enjoin. *See generally* App. Plaintiffs
allege that the City is evicting unhoused persons from public areas and confiscating their
belongings under the pretense of health and sanitation. *Id.* at 3.

Plaintiffs have not made an adequate showing of irreparable injury to merit
injunctive relief. While Plaintiffs have filed a declaration from Jacobs that details two
occasions when Defendants confiscated his belongings under the Zone ordinances,
Plaintiffs have not demonstrated that such enforcement exists beyond Jacobs. Plaintiff
Serin, who has allegedly experienced similar enforcement, has not attached a related
declaration. Without more, the Court cannot conclude that Plaintiffs or the putative class
they represent are experiencing continuing harm due to this ordinance in particular.

The Court is concerned about the allegations that Defendants are confiscating
unhoused residents' essential possessions and transporting them eighteen miles across
Los Angeles without any realistic hope of retrieval. The Ninth Circuit has repeatedly
upheld injunctions barring the enforcement of other portions of the same ordinance at
issue here. *See Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012); *Garcia v.
City of Los Angeles*, 11 F.4th 1113 (9th Cir. 2021). Indeed, in its briefing the City cites
*Garcia*, which concerned LAMC § 56.11(i), as related to this case. *See* Def.'s Supp.
Briefing at 1. In both *Garcia* and *Lavan*, the Circuit upheld the district court's finding of
a likelihood of success on the merits of plaintiffs' Fourth Amendment claims, because
"by seizing and destroying [plaintiffs'] unabandoned legal papers, shelters, and personal
effects, the City meaningfully interfered with [plaintiffs'] possessory interests in that
property." *Lavan*, 693 F.3d at 1030; *Garcia*, 11 F.4th at 1119.

The Circuit has made clear that mere "[v]iolation of a City ordinance does not
vitiate the Fourth Amendment's protection of one's property." *Lavan*, 693 F.3d at 1029.
The *Garcia* district court found that seizing and immediately destroying bulky items
without a warrant or pursuant to a warrant exception, even for the purpose of protecting
health and safety, facially violated the Fourth Amendment's prohibition against
unreasonable seizures. *Garcia v. City of Los Angeles*, ___ F. Supp. 3d ___, No. 19-CV-
06182-DSF, 2020 WL 2129830, at *3 (C.D. Cal. Feb. 15, 2020). And more than a decade
ago, the *Lavan* district court found that the City's seizure and destruction of unhoused
people's property were unreasonable:

> [T]he City's interest in having clean parks is outweighed by the more immediate interest of the

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 21-06003-DOC-KES                                    Date: November 19, 2021
                                                                          Page 5

plaintiffs in not having their personal belongings destroyed. As this court previously found, the loss of such items such as clothes and medicine threatens the already precarious existence of homeless individuals by posing health and safety hazards.

*Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1015 (C.D. Cal. 2011) (quoting *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1573 (S.D. Fla. 1992)) (internal citations omitted).

Plaintiffs do not allege Fourth Amendment violations in their Second Amended Complaint. As such, the Court DENIES Plaintiffs' Application for a TRO.

## IV.     Disposition

The Court DENIES Plaintiffs' Application for a Temporary Restraining Order.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                      Initials of Deputy Clerk: kdu
CIVIL-GEN